In Re: Subpoena Served by the Pennsylvania Crime Commission on the Judicial Inquiry and Review Board, Dated June 7, 1983, Number 83194.

In Re: Petition for Enforcement of a Subpoena to the Pennsylvania Judicial Inquiry and Review Board

376

Hearings on July 6, July 20 and September 15, 1983 before President Judge CRUMLISH, JR.

*Donald E. Johnson,* Chief Counsel, with him *John J. Contino,* Counsel, and *Joan Weiner,* Special Counsel, for Pennsylvania Crime Commission.

*Perry S. Bechtle,* with him *Susan Warnock Thomas,* for Judicial Inquiry and Review Board.

MEMORANDUM OPINION BY PRESIDENT JUDGE CRUMLISH, JR., December 28, 1983:

This case has focused on major legal issues heretofore unresolved primarily because of their novelty in judicial administration.

Never before have the effects of an Article of the Pennsylvania Constitution[1] which purports to remedy evils found in the Judicial Branch been delineated nor the method of executing it enunciated in the newly-established unified judiciary.

Deeply-concerned constitutional delegates brought forth the creation of a body whose sole purpose was to examine and pass upon the behavior of a member of the judiciary whose conduct appeared to derogate the administration of justice. To insure its impartiality the delegates to the Convention specifically bestowed upon the mechanism, in its investigation and findings, the cloak of confidentiality. Seemingly, it was the best of both worlds by protecting the innocent and exposing the malefactor and his misdoings. This case for the first time tests its viability. Three significant unanticipated factors precipitated this litigation:

1)  The target of the inquiry is a Supreme Court Justice;

2)  A statutory body, the Pennsylvania Crime Commission under the aegis of its prescribed mandate attempted to cirvumvent the protective devices of the Judicial Inquiry and Review Board; and

3)  the Chief Justice undertook, with or without direction of the Supreme Court, an attempt to initiate an investigation thus undermining the constitutional authority of the Judicial Inquiry and Review Board.

Presently before this Court for consideration and disposition are the motion of the Pennsylvania Judicial Inquiry and Review Board (Board) to quash a subpoena of the Pennsylvania Crime Commission (Commission) (No. 1672 C.D. 1983), the Board's preliminary objections thereto and the Crime Commis-

---

[1] *See* Article V, Section 18 of the Pennsylvania Constitution.

sion's application for enforcement of its previously-issued subpoena (No. 1810 C.D. 1983). We heard three days of testimony by (1) Alvin B. Lewis, Jr., Esq., a member of the Commission, (2) Richard A. Sprague, Esq., former Special Counsel to the Board, and (3) Richard E. McDevitt, Esq., Executive Director of the Board. Counsel made extensive persuasive argument.

PROCEDURAL AND SUBSTANTIVE HISTORY

On July 6, 1983, this Court convened a hearing on the motion of the Judicial Inquiry and Review Board to quash the subpoena served on it by the Pennsylvania Crime Commission. On July 20, 1983, we scheduled a second hearing to consider the Crime Commission's motion to enforce the Commission subpoena. On September 15, 1983, pursuant to our September 8th Court order, a third and final hearing was held to clarify certain prior testimony and to elicit additional evidence. A stipulation of facts by the parties was submitted to the Court at the second hearing. The stipulations provided:[2]

> 1. On June 7, 1983, the Pennsylvania Crime Commission, by its Chairman, Dean Roach, Commissioner Alvin B. Lewis, Jr., Commissioner Royal D. Hart and Executive Director Wallace P. Hay, issued a Pennsylvania Crime Commission subpoena to the Judicial Inquiry and Review Board, care of Richard E. McDevitt, Executive Director.

> 2. The subpoena was addressed to the Judicial Inquiry and Review Board, Three Penn Center Plaza, 15th and Market Streets, Philadelphia, Pennsylvania.

> . . . .

_____

[2] Stipulation of fact number 3, noting that a copy of the Commission's subpoena is attached to the stipulation, has been omitted.

4. On Monday, June 13, 1983, at 10:53 a.m., said subpoena was served upon Richard E. McDevitt, Esq., Executive Director of the Judicial Inquiry and Review Board at 1428 Three Penn Center Plaza, Philadelphia, Pennsylvania.

5. Said subpoena was served by Joseph V. Morace, who was then a Special Agent Supervisor of the Pennsylvania Crime Commission.

6. At the time of service of said subpoena, attached to said subpoena were copies of the Pennsylvania Crime Commission's Resolutions dated June 1, 1983, and June 2, 1983.

7. The Pennsylvania Crime Commission subpoena was returnable on the 28th day of June 1983 at 10:00 a.m. in St. Davids, Pennsylvania.

8. The subpoena called for the entire record of all proceedings including, but not limited to, testimonial transcripts and documents of the Judicial Inquiry and Review Board's investigation and hearings in the matter of Justice Rolf Larsen.

9. Between calendar dates May 8, 1983, and May 25, 1983, numerous articles and editorials were printed and appeared in The Philadelphia Inquirer newspaper, a publication of general circulation.

10. Said articles on said dates purported to deal with the Pennsylvania Judicial Inquiry and Review Board's investigation of Supreme Court Justice Rolf Larsen, the Board's permanent sealing of the record, and identifying many of the witnesses who testified in this matter.

11. Many, if not all, of the witnesses identified as testifying in this matter were high ranking public officials and candidates for public office.

12. Any copies of said articles that the Commission introduces or references during this hearing are agreed, by and between parties, to be true and correct and authentic copies of the articles as they appeared in The Philadelphia Inquirer.

13. There is no stipulation between the parties as to the truth, accuracy and veracity of said allegations.

From the record developed, it appears that Supreme Court Justice ROLF LARSEN has been under investigation by the Judicial Inquiry and Review Board and counsel appointed by former Chief Justice O'BRIEN for alleged judicial misconduct. As indicated by the stipulation of facts, a substantial portion of the alleged verbatim transcripts of the testimony addressed at the Review Board hearings appeared in various major newspapers. These articles, copies of which were entered into evidence in support of the enforcement proceeding, contain allegations about and references to Justice LARSEN's conduct, which has shaken and continues to shake the public confidence in the administration of justice in this Commonwealth —allegations of rampant racism, vote-fixing, political maneuvering, personal eccentricities, and the indiscreet, if not unlawful, use of the influence of his office for the political and personal benefit of his friends.

SUBSTANTIVE HISTORY

The Pennsylvania Crime Commission is a statutory creature made operational by legislative mandate pursuant to the provisions of the Pennsylvania Crime Commission Act.[3] As such, is it empowered to exercise only those powers and duties provided therein:

---

[3] Act of October 4, 1978, P.L. 876, *as amended*, 71 P.S. §§1190.1-1190.11.

(1)  To inquire into organized crime and activities of persons engaged in or associated with organized crime.

(2)  To inquire into public corruption and the activities of persons engaged in and associated with public corruption.

(3)  To make a detailed written report of every completed investigation which may include recommendation for legislative or administrative action.

. . . .

(6)  Through its chairman, to call upon the department heads of State Government and State Agencies for such information and assistance as is needed to carry out the functions of the commission.

(7)  To require the attendance and testimony of witnesses and the production of documentary evidence relative to any investigation which the commission may conduct in accordance with the powers given it. . . .

. . . .

(11)  To perform such other acts as are necessary for the proper functioning of the commission.

71 P.S. §1190.4.

Thus, the Commission, by its legislative mandate, has two important functions: (1) to inquire into organized crime and public corruption, and (2) to submit a report of every completed investigation which, if required, would include a recommendation of legislative or *administrative* action.[4]

The genesis of the Crime Commission's entry into this controversy, inspired by public clamor, blossomed

---

[4] *See* 71 P.S. §1190.4.

on May 25, 1983 when, at a meeting of the Crime Commission, the Commission, the Executive Director and the Chief Counsel, after reviewing The Philadelphia Inquirer's revelation of the alleged verbatim transcripts of testimony developed by the Board, decided by formal resolution to investigate the possibility of Justice Larsen's having engaged in "public corruption."[5]

Mr. Lewis testified that, on the strength of the substance of the newspaper articles alone, the Commission believed it had the duty "to investigate the public corruption and activities of the witnesses before the Judicial Inquiry and Review Board and the first step was to obtain the transcripts." (N.T. 7/20/83, p. 23). Apparently, the Crime Commission was only interested in evidence of public corruption as defined in the statute and its purpose was not to obtain evidence of "organized crime," at least at the time of these hearings.[6] Having made the decision to investigate the alleged conduct of Justice Larsen as it was reported in the published transcripts of the Board and knowing that the record made before the Board was deemed to be confidential by the Supreme Court, the Commission sought to obtain by subpoena the transcripts and supporting documentation in the

---

[5] Section 2 of the Act defines "public corruption" as "[t]he unlawful activity of any public official or public employee under color of or in connection with any public office or the agent of any candidate for public office under color of or in connection with any public office or employment." 71 P.S. §1190.2.

[6] Section 2 of the Act defines "organized crime" as "[t]he unlawful activity of an association trafficking in illegal goods or services, including but not limited to gambling, prostitution, loan sharking, controlled substances, labor racketeering or other unlawful activities or any continuing criminal conspiracy or other unlawful practice which has as its objection large economic gain through fraudulent or coercive practices or improper governmental influence." 71 P.S. §1190.2.

protective custody of the Judicial Inquiry and Review Board. *See In the Matter of Petition of the Pennsylvania Bar Association and Frank B. Boyle,* Pa. , 460 A.2d 721 (1983).

When the subpoena issued, the Board filed a motion to quash the subpoena. The Commission filed an application to enforce the subpoena. This Court is asked to decide whether that subpoena should be enforced or whether it should be quashed, since it seeks access to allegedly confidential and unobtainable material.

It should be noted at this juncture that the Crime Commission is a legislative being and an independent agency[7] authorized to exercise only those powers expressly granted to it by statute. *See Pennsylvania Human Relations Commission v. Transit Casualty Insurance Co.,* 478 Pa. 430, 438, 387 A.2d 58, 62 (1978). The Crime Commission is solely an investigative entity and, as such, it must rely upon the duties and powers set forth in Section 4(3) of the Crime Commission Act, *i.e.,* "[t]o make a . . . recommendation for legislative or administrative action."[8] Noticeably absent from its powers and duties is the authority to prosecute anyone who, in the Commission's estimation, is at least by the implication of investigation, guilty of wrongdoing.

Mr. Lewis testified that, if the record developed by the Board had disclosed evidence of criminality, it would have been the intention of the Commission to "turn it over to the prosecuting agency." (N.T. 7/20/83, p. 34) Consistent with the Commission's purpose, a four-step decision-making process is necessary prior

---

[7] Independent agency status is conferred on the Commission by the language of Section 102 of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, 71 P.S. §732-102.

[8] *See* 71 P.S. §1190.4(3).

to prosecution for alleged wrongdoing. First, the Commission must by resolution decide to inquire into public corruption or organized crime; secondly, it must then make a written report of a completed investigation including therein a recommendation for "administrative action;" thirdly, there must be a decision by the appropriate administrative agency, to independently review the Commission's findings and recommendations so that that agency, independent of the Commission, may decide whether criminal prosecution is warranted; and finally, should that agency decide that the inquiry merits consideration of possible prosecution by the appropriate law enforcement agency (*e.g.*, Attorney General or Local District Attorney), it shall submit its findings to that agency.

The Judicial Inquiry and Review Board, unlike the Crime Commission, is a creature both of the Pennsylvania Constitution[9] and Title 42 of the Pennsylvania Consolidated Statutes[10] encompassing the Judiciary and Judicial procedure known in practice as the "Judicial Code." The Board was conceived as a vehicle to supervise the conduct of members of the judiciary.

Prior to the Constitutional Convention of 1967, there existed no specific constitutional provision for disciplining members of the judiciary less forcefully than by removal. In *Carpentertown Coal & Coke Co. v. Laird,* 360 Pa. 94, 61 A.2d 426 (1948), the Supreme Court strongly asserted the existence of its common law King's Bench powers of judicial supervision. The holding in that case was, however, tempered by *Bowman's Case,* 225 Pa. 364, 74 A. 203 (1909), and *Commonwealth v. Gamble,* 62 Pa. 343 (1869), where the Court had previously concluded that "[a] constitutional direction as to how a thing is to be done is

---

[9] *See* Article V, Section 18 of the Pennsylvania Constitution.
[10] *See* 42 Pa. C. S. §2101-2105, §3331-3334.

exclusive and prohibitory of any other mode which the legislature may deem better or more convenient." *Bowman's Case* at 367, 74 A. at 204. That common law powers and legislative directives are but discreet manifestations of authority is unquestionable, but where there was no precedent for the precise issue of the Supreme Court's powers at that time, the resolution of the interplay of the two bases for that authority was and still remains tantalizingly ambiguous.

Against this background, the delegates to the 1967 Convention included in the new Constitution provisions directing the creation and operation of the Judicial Inquiry and Review Board, patterned after the then-operational California Commission on Judicial Qualifications.[11]

To summarize the pertinent portions of those new provisions, found at Article V, Section 18: (1) The nine members of the Board shall be comprised of five judges appointed by the Supreme Court, and two lawyers and two lay persons all appointed by the Governor; (2) A justice or a judge may be disciplined for engaging in prohibited activities enumerated in Article V, Section 17,[12] or for "misconduct in office, neglect of duty, failure to perform his duties, or conduct which prejudices the proper administration of justice or *brings the judicial office into disrepute. . . .*" (emphasis added); and (3) The Board shall keep itself apprised of possible grounds for discipline, preliminarily investigating same if the need arises. If the result of the preliminary investigation so war-

---

[11] *See In Re: Stanley M. Greenberg, Judge, Court of Common Pleas of Philadelphia*, 442 Pa. 411, 413-14 n. 1, 280 A.2d 370, 370-71 n. 1 (1971).

[12] Article V, Section 17(b), provides in part that "[J]ustices and Judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court.

rants, the Board may order a hearing and direct testimony and the production of documents. If the evidence so convinces the Board, it then shall recommend what it perceives to be the appropriate disciplinary action to the Supreme Court.

## PRIVILEGE OF CONFIDENTIALITY

The Crime Commission proffers three arguments to gain access to the record of proceedings made before the Board. First, the Commission argues that the Pennsylvania Constitution does not cloak the records of the Board with permanent and absolute confidentiality in all cases where the Board does not recommend disciplinary action to the Pennsylvania Supreme Court. Secondly, the Commission contends that any privilege of confidentiality is a qualified privilege that must yield when the purposes underlying the existence of the privilege are no longer served by that confidentiality. The Crime Commission is aware that confidentiality encompasses the Board's proceedings and the recent decisions by the Pennsylvania Supreme Court in *Petition of the Pennsylvania Bar Association* and *First Amendment Coalition v. Judicial Inquiry and Review Board,*      Pa. , 460 A.2d 721 (1983), which hold that, absent a recommendation by the Board, all of the papers filed and testimony given retain their cloak of confidentiality. *Id.* at    , 460 A.2d at 722. The Supreme Court, in *First Amendment Coalition,* based that decision in part upon Article V, Section 18 of the Constitution, which states in part:

> (g)  If, after hearing, the board finds good cause therefor, it shall recommend to the Supreme Court the suspension, removal, discipline or compulsory retirement of the justice or judge.

(h) The Supreme Court shall review the record of the board's proceedings on the law and facts and may permit the introduction of additional evidence. It shall order suspension, removal, discipline or compulsory retirement, or wholly reject the recommendation, as it finds just and proper. . . . *All papers filed with and proceedings before the board shall be confidential but upon being filed by the board in the Supreme Court, the record shall lose its confidential character.* The filing of papers with and the giving of testimony before the board shall be privileged. (Emphasis added).

The Commission, in support of its first argument regarding permanent and absolute confidentiality, points to the numerous prior occasions when the Board has lodged with the Supreme Court its record in which sanctions were not recommended. Mr. Sprague so testified at the September 15, 1983 hearing. In relating a conversation with Mr. McDevitt, the Board's Executive Director, Mr. Sprague said that Mr. McDevitt assured him that the transcripts of hearings would get to the Supreme Court; basing his assurance on past practice of the Inquiry Board that, regardless of the Board's decision, the transcript had in fact been transmitted to the Supreme Court. And he [Mr. McDevitt] expressed his belief that there would be no change in that past practice nor did he foresee any change in practice for the instant investigation. (N.T. 9/15/83, p. 24).

This practice was changed, however, subsequent to the media publications of the transcripts. Whether either by coincidence or design or both when the public attention was piqued, the Board requested and received an opinion letter from its counsel in which he advised the Board to discontinue its practice of for-

warding the record when no recommendation for censure was contained therein.

That opinion letter was fortified by imprimatur of the Supreme Court shortly thereafter, in *First Amendment Coalition,* where the Supreme Court wrote that "unless and until the Board 'recommend(s) the suspension, removal, discipline, or compulsory retirement of [a] justice or judge,' the Board's decisions are constitutionally its own, and may not be disturbed by this Court." *Id.* at   , 460 A.2d at 724. The Court stated further, "[t]he matter is constitutionally closed," *id.,* and that it could not reopen the matter or intrude upon the province of the independent, constitutionally-created Judicial Inquiry and Review Board. We must reject the argument that the Board may file or be legally compelled to file any record made pursuant to a duly-authorized investigation unless it makes a disciplinary recommendation. The confidentiality attaching to a record made before the Board cannot somehow in the course of litigation seeking otherwise lose its confidentiality.

The Commission next argues that the confidential status of the Board's records is of a qualified nature and that a balance of interest is necessary in the presence of unique and overwhelming mitigating circumstances. In support of this proposition, the Commission directs our attention to the United States Supreme Court decision in *Landmark Communications Inc. v. Virginia,* 435 U.S. 829 (1978).

*Landmark* was a subpoena and enforcement proceeding against a newspaper which published accurate confidential reports of an inquiry pending before the Virginia Judicial Inquiry and Review Board. At issue in *Landmark* were possible criminal sanctions against a newspaper which published these alleged verbatim transcripts. The narrow and limited ques-

tion there presented, then, was whether the First
Amendment permits the criminal punishment of third
persons who are strangers to the inquiry, including
the news media, for divulging or publishing

> truthful information regarding confidential pro-
> ceedings of the [Virginia] Judicial Inquiry and
> Review Commission. We are not here con-
> cerned with the possible applicability of the
> statute to one who secures the information by
> illegal means and thereafter divulges it. *We do
> not have before us any constitutional challenge
> to a State's power to keep the Commission's
> proceedings confidential* or to punish partici-
> pants for breach of this mandate. (Footnotes
> omitted; emphasis added.)

*Landmark,* 435 U.S. at 837.

The Court articulated several generic affirmative
explanations for maintaining a substantial degree of
confidentiality in the proceedings before these kinds
of tribunals:

> [T]o encourage the filing of complaints and the
> willing participation of relevant witnesses by
> providing protection against possible retaliation
> or recrimination. . . . Second, . . . the confiden-
> tiality of the proceedings protects judges from
> the injury which might result from publication
> of unexamined and unwarranted complaints.
> And finally, it is argued, confidence in the judi-
> ciary as an institution is maintained by avoid-
> ing premature announcement of groundless
> claims of judicial misconduct or disability . . . .
>
> In addition to advancing these general in-
> terests, the confidentiality requirement can be
> said to facilitate the work of the commissions in
> several practical respects. When removal or
> retirement is justified by the charges, judges
> are more likely to resign voluntarily or retire

without the necessity of a formal proceeding if the publicity that would accompany such a proceeding can thereby be avoided. (Footnotes omitted).

*Landmark,* 435 U.S. at 835-36. Thus, the Supreme Court acknowledged the appropriateness of confidentiality safeguards, but held that a publication's constitutional interest outweighs the state's imposition of criminal sanctions on persons removed from the initial investigation. *Landmark* is distinguishable because the confidentiality of the record of the official actions of the Virginia Commission was in no way drawn into question.

The factual postures of the *Landmark* and the instant controversy are very different. The Supreme Court's decision cannot legitimately be read to qualify the confidentiality of the record made before the Board. When that Court balanced the legitimate state interest of preserving the confidentiality of the proceedings before the Virginia Board and "those interests in public scrutiny and discussion of governmental affairs [by the press] which the First Amendment was adopted to protect," *id.* 435 U.S. at 839, the Court's concern was unmistakably directed to the sole issue of free speech. *Landmark* stands for the proposition that confidentiality safeguards are appropriate but, in the context of that particular case, *i.e.,* confidentiality versus freedom of the press, the constitutional guarantee of the First Amendment qualified the confidentiality of the material insofar as a newspaper, not a party to the proceedings nor a recipient of a subpoena to produce the material, had the constitutional protection to publish that material.

The only qualifying factor attached to the confidentiality of the records in the instant dispute then is whether the Board chose to release them to the Su-

preme Court for punitive action. The Board has chosen not to disturb the confidentiality of the proceedings by forwarding the record to the Supreme Court. We are left unmoved by the arguments put forth by the Commission that we have the authority to delve into the decision-making process of the Judicial Inquiry and Review Board. The language of our Constitution, as interpreted by our Supreme Court in *Pennsylvania Bar Association,* instructs us that the cloak of confidentiality can only fall when the record of Board proceedings is accompanied by a recommendation for censure and at no other time.

The Commission, in its final argument, maintains that the interests of the citizens of Pennsylvania in the effective administration of the criminal justice system can only be served if the privilege of confidentiality yields to a legitimate state law enforcement objective. Indeed, the people of this Commonwealth look to the Supreme Court, ''the Supreme judicial authority,'' to maintain the highest standard of conduct, for from its pronouncements there is no appeal. Even the slightest suggestion of impropriety must be avoided. There can be no doubt that the release of the alleged verbatim transcripts has generated significant negative public sentiment reflecting the credibility of every member of the judicial system in this Commonwealth. Its citizens cannot be assured that the administration of justice is functioning well when that machinery of justice is stopped in mid-cycle by legalistic roadblocks. Nevertheless, when examined, the entire qualified privilege argument must fail. *See Pennsylvania Bar Association.*

But these are not the only facts surfacing or legal issues raised by this litigation. There remain heretofore unresolved and very troubling questions which we shall discuss in order to fully explore the controversy presented to us and to provide guidance and

perhaps avoid further litigation on this question. As we heard testimony and looked at the evidence addressed by the Crime Commission, it is apparent that a unique legal issue involving the status of the Board's Special Counsel must for the first time be resolved.

### THE ROLE OF THE CHIEF JUSTICE AND MR. SPRAGUE

Mr. Sprague testified that, in December of 1980, Former Chief Justice HENRY X. O'BRIEN telephoned him and that Chief Justice O'BRIEN

> stated that there had appeared allegations in the Philadelphia and the Pittsburgh press concerning Justice Larsen, that he, Chief Justice O'Brien, did not know whether there was any truth whatsoever to whatever was alleged in the papers but that he felt in his position as the Chief Justice of Pennsylvania that there was a need for an immediate commencement of an investigation of the allegation.

> He asked me would I consider accepting an appointment to investigate .the allegations and stated that the Judicial Inquiry and Review board, the majority of its members were appointed by the Supreme Court and the personnel who worked for the Judicial Inquiry and Review Board were employees of the Board and he, Chief Justice O'Brien, felt that it would not have a proper appearance for the investigators of the Judicial Inquiry and Review Board to be conducting this investigation of Justice Larsen because of Justice Larsen's position in the SupremeCourt and there being a question of whether the Supreme Court was in some way influencing the course of the inquiry.

> Chief Justice O'Brien stated to me that if I would accept such an appointment, I would be totally free in conducting the investigation and

that I was authorized to hire whoever I wanted for the purposes of conducting the investigation and that he as Chief Justice would see that there were funds appropriated or provided to pay for the salaries and the expenses.

I told Chief Justice O'Brien that I would be honored to accept the appointment and I would undertake the assignment. I told him that I would use the personnel of my own office for the purpose of doing the investigation and that there would be no fee charged whatsoever with regard to anybody's fee for services but that I would expect to be repaid whatever were the out-of-pocket costs and expenses. (N.T. 9/15/83, pp. 8-9)

Mr. Sprague further testified that the former Chief Justice gave him the authority to hire a staff necessary to carry on his investigation and for that purpose he intended to use his personal staff at no charge to the Supreme Court, except for ordinary expenses to be reimbursed on a monthly basis by the Judicial Inquiry and Review Board.

On December 19, 1980, former Chief Justice O'BRIEN wrote to Mr. McDevitt, with a copy to Mr. Sprague, a confidential letter which stated:

I have obtained the services of Richard A. Sprague, Esquire, as Special Counsel to the Judicial Inquiry and Review Board for the purposes of conducting a thorough investigation of the charges, which have appeared in the public press, involving our Court. Mr. Sprague will be in complete charge of the investigation, including the services of investigators whom he will hire.

Mr. Sprague is undertaking this work at my request, and is doing this as a public service, without charge.

Subsequent testimony by Mr. McDevitt revealed that the Board did not engage paid counsel but historically had relied upon volunteers to work for the Board. Mr. McDevitt testified that, following the extensive news media coverage of Justice LARSEN and the Supreme Court, the Board had in mid-December of 1980 independently decided to investigate under the direction of special counsel and to pursue its mandate. (N.T. 9/15/83, p. 54). The Board was considering three attorneys, one of whom was Mr. Sprague.

Following the Chief Justice's earlier conversation with Mr. Sprague, Mr. McDevitt informed all of the members of the Board of these developments, some of whom were distressed by what they considered to be an intrusion by the Chief Justice into the affairs of the Board.

On December 24, 1980, Mr. McDevitt, writing to Mr. Sprague for the Board, delineated his duties and responsibilities:

> This is your authority, as Special Counsel for the Judicial Inquiry and Review Board, to carry out on behalf of the Board an inquiry into the facts and circumstances involving a member or members of the Supreme Court of Pennsylvania in light of certain charges that have been made by the public press of which wou are aware. . . . Further, it is anticipated that you will render a report to the Judicial Inquiry and Review Board or a duly authorized committee thereof, wherein you will present such factual conclusions as you have reached and the basis or bases thereof.

> . . . You understand, of course, that confidentiality must prevail throughout the proceedings before the Board under the previsions of Section 18, Article V of the Pennsylvania Constitution.

When questioned as to his understanding of his duties, Mr. Sprague replied in substance:

> I perceived my assignment as being an independent investigator appointed by the Chief Justice and that I would have the cooperation of Mr. McDevitt and the Judicial Inquiry and Review Board personally and in an official capacity. (N.T. 9/15/83, p. 14)
>
> Mr. McDevitt . . . turned over to me a file that he had which he said represented the entirety of what he by that time had obtained or had been furnished to him concerning any allegations regarding Justice LARSEN. (N.T. 9/15/83, p. 16)
>
> I took up with Mr. McDevitt that I wanted to utilize the powers of the Board and create a species called a preliminary hearing. . . . And it's in that light that I then used the subpoena power of the Inquiry Board in putting people under oath for the preliminary hearing. (N.T. 9/15/83, p. 20)
>
> I took it from the beginning, Your Honor, that the appointment meant for the entirety of the investigation to be submitted ultimately back to the Chief Justice and the other members of the Supreme Court except for Justice Larsen. (N.T. 9/15/83, p. 21)

An obvious conflict quickly developed between the statutory and constitutional mandate of the Board and the involvement by the former Chief Justice and his successor, leaving the confidentiality of the proceedings in confusion. We are presented with the question: How can the Board's confidentiality be preserved when an employee, acting independently of it, has total access to its records? To resolve that question, we must decide by what authority the Chief Justice appointed Mr. Sprague to investigate a member of the Supreme Court.

We have painstakingly reviewed the Pennsylvania Constitution and statutes, and it is apparent to us that there is little or no information or direction defining the powers and authority of the Chief Justice vis-a-vis the collective body of the Supreme Court. Article 5, Section 2 of the Constitution dictates the following:

> The Supreme Court (a) shall be the highest court of the Commonwealth *and in this court shall be reposed the supreme judicial power of the Commonwealth;*
>
> (b)   shall consist of seven justices, one of whom shall be Chief Justice; and
>
> (c)   shall have such jurisdiction as shall be provided by law.   (Emphasis added).

The framers of the Constitution were aware of the position of the Chief Justice for, in fact, Article 5, Section 10(d), entitled "Judicial Administration," provides:

> The Chief Justice . . . shall be the justice . . . longest in continuous service on [the Court] . . . . The president judges of all other courts shall be selected for five-year terms by the members of their respective courts . . . .

However, the Constitution, in defining the administrative responsibilities of the unified judicial system, clearly provides for action by the collective body, or majority of the Supreme Court. Article 5, Section 10 does not even by inference charge to the Chief Justice the overseeing of the other Justices and Judges or the unified judicial system. Article 5, Section 10, provides that

> (a)   The *Supreme Court* shall exercise general supervisory and administrative authority over all the courts and justices of the peace, including authority to temporarily assign judges

and justices of the peace from one court or district to another as it deems appropriate.

(b)   The *Supreme Court* shall appoint a court administrator and may appoint such subordinate administrators and staff as may be necessary and proper for the prompt and proper disposition of the business of all courts and justices of the peace.

(c)   The *Supreme Court* shall have the power to prescribe general rules governing practice, procedure and the *conduct of the courts,* justices of the peace and all officers serving process or enforcing orders, judgments or decrees of any court or justice of the peace, including the power to provide for assignment and reassignment of classes of actions or classes of appeals among the several courts as the needs of justice shall require, and for admission to the bar and to practice law, and the administration of all courts and supervision of all officers of the judicial branch . . . .

In addition, Article V, Section 18 establishing the rules and procedures of the Board provides:

(j)   The *Supreme Court* shall prescribe rules of procedure under this section.

The rules and procedures governing the Judicial Inquiry and Review Board were adopted and promulgated by the Supreme Court on June 27, 1969, under the signature of then-Chief Justice BELL.

The Constitution and relevant statutes do in fact define in specific terms the duties of the *Chief Justice* as opposed to the *Supreme Court.* For instance, pursuant to Article IV, Section 17, the Chief Justice shall preside over the trial of any contested election of the Governor, Lieutenant Governor or Attorney General. Similarly, the Chief Justice, as distinguished from the

Supreme Court as a body, shall (1) accept a request from a common pleas court president judge for the designation of a judge from another judicial district to act as the election return board when no one within the district is eligible;[13] (2) shall select four judges to serve on the Pennsylvania Commission on Sentencing;[14] (3) shall appoint a non-judiciary member of the Capitol Preservation Committee;[15] and (4) shall review and approve decisions of the Department of General Services regarding the size, character, quantity and method of distribution of various publications to be printed for use by the "judicial department."[16] These statutory duties are clearly of limited scope and constitute the entire litany of his statutory and constitutional assignments.

It appears without doubt that the Constitutional authors analogized the duties of the Chief Justice to a corporate Chief Executive Officer or Chairman of the Board in the private sector. Therefore, the Chief Justice is the titular head, spokesman and enforcer of the orders of the collective body, but having very limited specific individual authority. In short, the Chief Justice announces and carries out the mandate of the Supreme Court but in no sense individually determines the Court's will nor alone acts as the "Supreme Judicial Authority."

Any attempt by a Chief Justice to initiate an independent investigation of a fellow Justice violates the constitutionally-ordained prerogative of the Judicial Inquiry and Review Board. That there exists a body whose sole constitutional purpose is to undertake without judicial interference an orderly, unbiased and objective investigation of a member of the Judi-

---

[13] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §3153(b).

[14] 42 Pa. C. S. §2152.

[15] Act of December 20, 1982, P.L. 1442, 71 P.S. §1047.24.

[16] Act of May 8, 1923, P.L. 161, *as amended*, 71 P.S. §1632.

ciary is made indisputably clear in Article V, Section 17 which speaks of "Prohibited Activities" and states in pertinent part:

> (d)   No duties shall be imposed by law upon the Supreme Court or any of the justices thereof . . . except such as are judicial, nor shall *any of them* exercise *any power of appointment except as provided in the Constitution.*

This conclusion is not intended to impugn the integrity of the former nor of the present Chief Justice. They have construed their authority in a genuine attempt to erase any suggestion of impropriety by a Justice of the Supreme Court.

We are guided by Justice ZAPPALA's concurring opinion in *In re Proceedings of the Judicial Inquiry and Review Board Concerning "XYZ"* (No. 72 E.D. Misc. Dkt. 1983, filed May 6, 1983), where the Court refused plenary jurisdiction of a petition seeking to open the record in this matter. Besides reinforcing the position that the Board's record is confidential, Justice ZAPPALA succinctly pointed out that to meddle in the structure, function and mandate of the Board is prohibited.

> The Board was established as an independent Board not beholden to this Court until a recommendation of discipline is filed. . . . To hold otherwise would be to permit this Court to interfere at any time in the proceedings before the Board, even to the extreme of prohibiting the Board from considering an action properly filed.

*Id.,* slip op. at 4-5.

Nowhere have we observed in the Constitution a provision which authorized the Chief Justice to appoint anyone to specifically investigate the activities

of a fellow justice. Article V, Section 17 expressly prohibits such an appointment by any justice except as provided by the Constitution. The framers of the Constitution have, in their wisdom, delegated this responsibility to the Judicial Inquiry and Review Board. Therefore, any independent investigation by Mr. Sprague of Justice LARSEN was void *ab initio* and any record or recommendations produced as a result of his independent investigation were void from their inception.

Hindsight aside, Mr. Sprague participated in the investigation of Justice LARSEN in some capacity. Our inquiry into the powers of the Chief Justice and the role of Mr. Sprague leads us to the conclusion that, although his entry into the investigation was initiated by the Chief Justice without the knowledge or consent of the Board, Mr. McDevitt's subsequent contact with the individual Board members and letter of December 24, 1980, were sufficient to bring Mr. Sprague's work within the Board's inquiry. Since Mr. Sprague was on the list of prospective legal candidates sought to be engaged by the Board and in fact used the facilities, powers and mandate of the Board, we find him to have been incorporated therein. Mr. Sprague's activities for the purposes of this litigation were the Board's. Mr. Sprague is precluded from forwarding any report for the Supreme Court's consideration nor divulging any of the proceedings before the Board, *Pennsylvania Bar Association,"XYZ" Petition,* and *First Amendment Coalition.*

Lest this opinion be misread, let there be no misunderstanding that it is an attempt by one member of the judiciary to protect another from examination by the Crime Commission. It is not. What we hold today is that the Crime Commission may not subpoena that record made before the Judicial Inquiry and Review Board in its review of the activities of Mr. LAR-

SEN. We have not held that the Crime Commission may not plow the same ground as the Board but only that in its investigation it may not obtain the record made before the Board.

The Commission by its mandate has the duty to engage into an inquiry of public corruption wherever it may be found. If, as in this controversy, the Commission resolves to investigate public corruption, it must certainly press on. We know of no statutory or constitutional prohibition to the Commission investigating this matter anew and reaching a different conclusion than the Board which must have, in its estimation, at least reached the conclusion that a member of the judiciary had not engaged in public corruption since that conduct would seem sufficient to find good cause to recommend some kind of punitive action to the Supreme Court.

Be that as it may, the Crime Commission has a number of options it may pursue to resolve the inquiry presently before it. First, the Commission may write a report, directed to the legislature, setting forth its findings and outlining any statutory or constitutional changes the legislature may deem appropriate. Secondly, the Crime Commission may make a complete investigation with a report directed to the Judicial Inquiry and Review Board. Contained therein may be the exoneration of Mr. LARSEN or a recommendation that the Board further investigate the matter and pursue the proper administrative relief by forwarding a report to the Supreme Court with a recommendation of punitive action. Finally, the Commission may, if the circumstances dictate, as in the case of any individual, forward its findings to the proper prosecuting agency so that, for example, the Attorney General may review the Commission's investigation and *independently* decide whether further action by his agency is warranted.

## *Conclusion*

Charges of manifest misbehavior by a member of the judiciary, particularly a Justice of the Supreme Judicial Authority in this Commonwealth, would seem to cry out for open and full disclosure. By voluntary or mandatory means, the public should be privy to the facts, for only then can it have confidence in the quality of judicial performance. Indeed, if the Judiciary is to command the respect of its citizens, it must be forthright in establishing its own self-respect.

Distasteful as it may seem to some members of the Judiciary, conduct which does not merit the esteem of its colleagues and the citizens of this Commonwealth it serves must be censured. If even the slightest inference of parochial protectiveness appears through the use of twisting technicalities, collegiality or self-defense, it must be exposed, remedied and censured if indeed it is proper and necessary.

In granting the Board's motion to quash the subpoena, we are obliged to concede with regret that the cloud of suspicion will hover over us all. This is a tragic episode in an otherwise distinguished history of the Pennsylvania Judiciary, and an inescapable reflection on those who have earnestly sought to serve with dignity and integrity. ''This matter is constitutionally closed.'' *First Amendment Coalition* at     , 460 A.2d at 724.

### ORDER

Upon consideration of the Pennsylvania Crime Commission's petition for enforcement of a subpoena and the Pennsylvania Judicial Inquiry and Review Board's answer thereto, said petition for enforcement is denied and the Pennsylvania Judicial Inquiry and Review Board's motion to quash the Pennsylvania Crime Commission's Subpoena Number 83194 is granted.